No. 08-1334

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————

## LARRY MONROE,
on behalf of himself and all others similarly situated,

*Plaintiff-*

*Appellant,*

v.

## THE CITY OF CHARLOTTESVILLE, VIRGINIA,
## TIMOTHY J. LONGO, SR., In his official capacity,
## JAMES MOONEY, Police Officer in his official capacity,

*Defendants-*

*Appellees.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT CHARLOTTESVILLE

————————

### BRIEF OF APPELLANT
### LARRY MONROE

————————

Neal L. Walters                    Deborah C. Wyatt
SCOTT KRONER, PLC                  WYATT & ASSOCIATES
418 East Water Street              300 Court Square
Post Office Box 2737               Charlottesville, Virginia 22902
Charlottesville, Virginia 22902    Telephone (434) 296-4130

Telephone: (434) 296-2161                E-mail: DWESQ@aol.com
E-mail: nwalters@scottkroner.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF SUBJECT MATTER JURISDICTION
AND BASIS FOR APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      I.     THE DISTRICT COURT ERRED IN HOLDING THAT NO
RACE-BASED CLASSIFICATION OCCURRED WHEN THE
DEFENDANTS SPECIFICALLY TARGETED ONLY BLACK
MEN TO PROVIDE DNA SAMPLES IN ORDER TO HAVE
THEM ESTABLISH THAT THEY WERE NOT THE SERIAL
RAPIST BEING SOUGHT BY AUTHORITIES . . . . . . . . . 16

          A.    Where government actors have adopted a policy which
explicitly classifies by race, no separate allegation or proof
of discriminatory animus or intent is required. . . . . . . . 17

          B.    It is both alleged and undisputed that the Defendant govern-
ment actors had a policy of seeking DNA samples only
from black men; this constituted a race-based classification
as a matter of law and fact. . . . . . . . . . . . . . . . . . . . . . 19

          C.    Criminal investigations limited to persons of a single race
are race-based government classifications; however,
investigating crimes is a compelling governmental interest
and when race is used in conjunction with other factors, so
as to produce a search which does not sweep too broadly,
such investigations can be narrowly tailored so as to be
constitutionally permissible. . . . . . . . . . . . . . . . . . . . . 23

          D.    The District Court's approach, concluding that fact that the
policy of seeking DNA samples only from black men

derived from victim reports identifying the assailant as a black male stripped the policy of its explicit, race-based classification creates fundamental problems when applied to other instances of governmental discrimination. . . . . . . 25

II    THE DISTRICT COURT ERRED IN RULING THAT, AS A MATTER OF LAW, THE PLAINTIFF COULD NOT STATE A CLAIM FOR UNREASONABLE SEIZURE BECAUSE IT FAILED TO RECOGNIZE THE LOW BURDEN PLACED ON THE PLAINTIFF AT THE PLEADING STAGE.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A.    Whether a person's belief that they were not free to decline a police officer's entreaties was reasonable is a context specific inquiry and a determination at the Rule 12(b)(6) stage that no claim could be made out deprived the Plaintiff of an opportunity to fully establish the context. . . . . . . 33

III.    THE PLAINTIFF IS AN APPROPRIATE CLASS REPRESEN-TATIVE, DESPITE HIS LACK OF LEGAL SOPHISTICA-TION, AND THE DECISION THAT HE WAS NOT SHOULD BE REVERSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

A.    The District Court's consideration of the Sclafani affidavit, while refusing to consider the Monroe affidavit, was an abuse of discretion . . . . . . . . . . . . . . . . . . . . . . . . 43

B.    Even without consideration of the Monroe affidavit, Mr. Monroe would be an adequate class representative. . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) . . . . . . . . . . . . 18, 20, 27

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . 41

*Anderson v. Sara Lee Corp.*, 508 F.3d 181 (4th Cir. 2008) . . . . . . . . . . . . . . . 15

*Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761 (4th Cir. 2003) . . . . . . . . 35

*Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955 (2007) . . . . . . . . 15, 38

*Brooks v. City of Winston-Salem*, 85 F.3d 178 (4th Cir. 1996) . . . . . . . . . . . . . 14

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 1999), *reh'g en banc denied,* 235 F.3d 769 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) . . . . . . . . . . . . . 17

*Choice Hotels Int'l, Inc., v. SM Prop. Mgmt., LLC*, 519 F.3d 200 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985) . . . . . . . . . 17

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) . . . . . . . . . . . . . . . 20

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) . . . . . . . . . . . . . . 15

*Erickson v. Pardus*, ___ U.S. ___, 127 S. Ct. 2197 (2007) . . . . . . . . . . . . . . . . 15

*Evans v. Newton*, 382 U.S. 296 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ex Parte Virginia*, 100 U.S. 339 (1880) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

iii

*Florida v. Bostick*, 501 U.S. 429 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Grutter v. Bollinger*, 539 U.S. 306 (2003) . . . . . . . . . . . 18, 21-24, 27, 28, 30, 31

*Hunter v. Erickson*, 393 U.S. 385 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*I.N.S. v. Delgado*, 466 U.S. 210 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Cable and Wireless, PLC, Securities Litigation*, 217 F.R.D. 372 (E.D. Va. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Griffiths*, 413 U.S. 717 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*International Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Jefferson v. City of Omaha Police Dep't*, 335 F.3d 804 (8th Cir. 2003) . . . . . . . 24

*Jordan v. Alternative Res. Corp.*, 458 F.3d 332 (4th Cir.), *reh'g en banc denied*, 467 F.3d 378 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138 (4th Cir. 2001) . . . . . . . . . . . . . . . . 15

*Loving v. Virginia*, 388 U.S. 1 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Michigan v. Chesternut*, 486 U.S. 567 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 34

*Republican Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir. 1992) . . . . . . . . . . . 15

*Robinson v. Gillespie*, 219 F.R.D. 179 (D. Kan. 2003) . . . . . . . . . . . . . . . . 42, 46

*Shaw v. Reno*, 509 U.S. 630 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Shelley v. Kraemer*, 334 U.S. 1 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

iv

*Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873) . . . . . . . . . . . . . . . . . . . . . 17

*Strauder v. West Virginia*, 100 U.S. 303 (1880) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Thompson v. Keohane*, 516 U.S. 99 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311 (4th Cir. 2006) . . . . . . . 40, 41

*United States v. Mendenhall*, 446 U.S. 544 (1980) . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Rose*, 889 F.2d 1490 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 34

*United States v. Springer*, 946 F.2d 1012 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . 34

*United States v. Weaver*, 282 F.3d 302 (4th Cir.  2002) . . . . . . . . . . . . . . . . . . . 34

*Wagner v. NutraSweet Co.*, 170 F.R.D. 448 (N.D. Ill. 1997) . . . . . . . . . . . . . . . 42

*Wayte v. United States*, 470 U.S. 598 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Williams v. Hansen*, 326 F.3d 569 (4th Cir. 2003) . . . . . . . . . . . . . . . . . 18, 19, 32

## <u>STATUTES</u>

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

## <u>MISCELLANEOUS</u>

Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1766 (2d ed. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed. R. App. P. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15, 35, 39

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

Michael R. Smith, *Depoliticizing Racial Profiling: Suggestions for the Limited Use and Management of Race in Police Decision-Making*, 15 Geo. Mason U. Civ. Rts. L.J. 219 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*, 117 Harv. L. Rev. 493 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# STATEMENT OF SUBJECT MATTER JURISDICTION
# AND BASIS FOR APPELLATE JURISDICTION

### Jurisdiction in the District Court

The Plaintiff filed suit under 42 U.S.C. § 1983.  The United States District Court for the Western District of Virginia (the "District Court") had jurisdiction under 28 U.S.C. § 1343(a)(3)-(4).

### Jurisdiction in the Court of Appeals

The District Court entered its final order, which disposed of all of claims at issue between the parties, on February 20, 2008.  The Plaintiff filed a notice of appeal on March 14, 2008.  Because the notice of appeal was filed within thirty days of the entry of the District Court's final order, it was timely.  Fed. R. App. P. 4(a)(1).  Because the notice of appeal was timely, this Court has jurisdiction to review the judgment of the District Court under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

I.     WHETHER GOVERNMENT ACTORS EN-
GAGE IN RACE-BASED CLASSIFICATION
WHEN, BASED UPON INFORMATION PROVIDED
BY THIRD PARTIES, THEY SEEK DNA SAMPLES
ONLY FROM BLACK MEN AS PART OF A
CRIMINAL INVESTIGATION

II.     WHETHER THE DISTRICT COURT ERRED
IN DISMISSING THE PLAINTIFF'S FOURTH
AMENDMENT UNREASONABLE SEIZURE
CLAIMS WHERE THERE WERE SUFFICIENT
FACTS TO INFER THAT THE ENCOUNTER
WITH THE POLICE WAS COERCIVE

III.     WHETHER THE DISTRICT COURT ABUSED
ITS DISCRETION IN FINDING THE PLAINTIFF
WOULD NOT MAKE AN ADEQUATE CLASS
REPRESENTATIVE WHERE ARE ALL OF THE
OTHER REQUIREMENTS OF RULE 23 WERE
CONCEDEDLY MET AND THE PLAINTIFF EX-
HIBITED REASONABLE LEGAL SOPHISTICA-
TION FOR A LAY PERSON

2

# STATEMENT OF THE CASE

## Nature of the Proceedings

This is an appeal from the District Court's dismissal of Plaintiff's Equal Protection Clause and Due Process Clause claims, brought pursuant to 42 U.S.C. § 1983, arising out of the Defendants' obtaining a DNA sample from him.

## Course of Proceedings

The Plaintiff filed an amended complaint setting forth claims in three counts and including a request for class certification on August 25, 2006. (JA 141-50). The Defendants moved to dismiss a portion of Count I and all of Count II. (JA 151-57). Thereafter the District Court granted the motion to dismiss a portion of Count I without leave to plead over and granted the motion to dismiss Count II with leave to plead over. (JA 164-76).

The Plaintiff then filed a second amended complaint setting forth additional factual allegations with respect to Count II. (JA 177-89). The Defendants again moved to dismiss Count II (JA 190-91) and the District Court again granted the motion (JA 199-209).

Once the status of the substantive claims was determined the Plaintiff brought on for hearing his request for class certification. Following a hearing (JA 215-

3

69), the District Court denied the request for class certification (JA 287, 290-98).  The trial court denied the Plaintiff's request for reconsideration of the ruling denying class certification.  (JA 300).

The parties then stipulated to the dismissal without prejudice of the remaining claims in the case (JA 301-02) and the Plaintiff thereafter filed a timely notice of appeal from the earlier orders dismissing a portion of Count I and Count II (JA 304-05).

<u>Disposition Below</u>

The District Court dismissed all of the claims that are being pursued on appeal, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim to state a claim upon which relief can be granted.

4

## STATEMENT OF FACTS

Sometime prior to April 1, 2002, citizens and law enforcement in Charlottesville became concerned about the possible presence in the area of a "serial rapist." (*See* JA 143-44, 178). An investigation ensued which involved the policies challenged in this case.[1] (JA 178).

In response to the presence of this possible serial rapist, the police department for the City of Charlottesville, under the direction of its chief, Defendant Longo, began what has been described as a dragnet of black males to obtain DNA samples for comparison with DNA from one or more of the rapes. (JA 178, 181). The samples were taken generally by buccal swab (Deposition of Timothy Long ("Longo Dep."), JA 17). Officers of any rank and experience, including patrolmen (field officers) as well as investigators, have approached black male individuals to obtain DNA samples. (Longo Dep. JA 59; *see generally* Longo Dep. JA 20-59). Defendants agree that 190 persons were approached through April 2004 to provide

---

[1] The case was dismissed at the Rule 12(b)(6) stage and the facts are therefore drawn from the Second Amended Complaint, as well as from other sources the parties agreed could be considered by the court with respect to the issue of class certification. In addition, the facts are stated as of the date that the Second Amended Complaint was filed though significant events have taken place since then (such as the cessation of the DNA searches upon the capture of the serial rapist).

DNA samples under the program described above, thirty of whom refused the request to provide a sample. (*See* Longo Dep. JA 29, 66). It is stipulated that all persons approached were black males. (JA 12).[2]

Over the course of investigation, at least four different composite images of the assailant have been prepared. (Longo Dep. JA 24). The last rape believed connected with this individual occurred in August 2004. (Longo Dep. JA 40). However, the procedures described below which are challenged in this case are, with a few modifications also discussed below, still in place. (*See, e.g., id.* JA 53 (meetings to determine who to approach for DNA samples are still taking place); JA 59 (modifications were made to operational procedures of the DNA collection program in April 2004, no indication that program was terminated)).

As individuals with recent criminal convictions generally already had DNA on file, they were not among those targeted as being "NOF" (NOF stands for "not on file"). (Longo Dep. JA 50). The "high priority" list, Longo explained,

> could simply be the product of a meeting. For example, we might be talking about eight or nine or ten or three people.

---

[2]The actual phraseology of the Stipulation is somewhat circuitous: "Each individual from whom a sample was requested . . . had skin color consistent with one or more of the descriptions of the assailant that were obtained . . . from the victims of the attacks. Each victim described her assailant as a black male."

6

. . . We want to look at this guy, but we don't have his
DNA. . . .

(Longo Dep. JA 51).   In 2004, the meetings were weekly or bi-weekly, but were at the

time that the Second Amended Complaint was filed either monthly, bi-weekly, or

weekly (Longo Dep. JA 39).   As discussed below, Monroe was approached after

being placed on such a weekly or bi-weekly list.

    Beyond presumably excluding those whose DNA was already on file, at

the time Monroe was approached, there was no policy whatsoever which narrowed the

pool of black males from whom a buccal swab sample might be sought.   As

Defendant Longo stated at his deposition, "the common thread among them [the

proposed class members] is their race."   (Longo Dep. JA 20). The "physical

characteristics aside from race and sex varied widely."  (Longo Dep. JA 22).  Though

Longo provided a list of potential additional factors that could possibly result in a

person being considered (ranging from prior criminal history, to calls to 911, to a

person's acting suspicious) (Longo Dep. JA 22-23), he could not identify what factors

were taken into consideration with respect to any specific class member and did not

alter his summary conclusion that the only "common thread" was race (Longo Dep.

JA 20).   There were no guidelines as to who should be approached other than black

males (JA 181, 185).

> . . .. [T]he description that we obtained from victims about
> this suspect – one common thread was that he was male
> and that he was African-American.  In addition to that there
> was a wide range of physical descriptors . . . which is
> anywhere from 5'6" to 5'7" to medium build to 6'2" and out
> of shape football player.

(Longo Dep. JA 20).

As evidenced on the videotaped deposition of Plaintiff submitted to the

Court, Plaintiff is a male of sufficient heft that his weight is a distinguishing feature (*see*

*also* JA 181).  Yet, although no female victim is reported to have described her

assailant as having such a characteristic (JA 181), Monroe, as a black male, was

nonetheless in the class of men approached for a sample.

When Monroe was approached, he had allegedly appeared on one of the

weekly lists of names of those from whom DNA was sought.  (*See* Transcript of

Proceedings in the General District Court of Charlottesville, Jan. 31, 2005, submitted

as Defendants' Exhibit 2 at the hearing on July 13, 2006, ("Gen. Dist. Tr.") 33-34).[3]

He came to be on the list because, according to a report by patrol officer Sclafani,

---

[3]Reference is made to this portion of the record pursuant to Fed. R. App.
P. 30(a)(2).  While a portion of this transcript is included in the Joint Appendix (JA
115-40), Officer Sclafani's testimony was inadvertently omitted. The complete
transcript, including Officer Sclafani's testimony, is included in the record.

Sclafani had seen Monroe on Chancellor Street and considered that he "[m]ay have been scoping out houses." (Gen. Dist. Tr. 38).

There are a number of ways to make "the list," including a call from Crimestoppers that someone looks like a composite, the individual's prior background, or a field contact. (Longo Dep. 22-23, 35). As Defendant Longo also acknowledged, a person could become a "person of interest," simply as a result of someone's calling Crimestoppers and saying "I just got a gut feeling, you need to check this guy out." (Longo Dep. JA 35). As he confirmed,

> Q:    I mean, some guy is looking funny out on the
> street somebody reports, would they then run the NCIC
> and the DMV records, you know, prior to determining this
> is a person we need to add to our list to get a sample?"
> A:    More likely than not that would, that would
> take place.

(Longo Dep. JA 49)

Thus, there were no guidelines or criteria for limiting those black males who would be approached. Rather black males could become "persons of interest" from whom a sample would then be sought in any of a variety of ways, from field officers believing someone looked like a composite (*see* Longo Dep. Exhibit 1, Refusal 16), to field officers reporting a hunch, to some anonymous person phoning

in that a black male was "acting funny." The only unifying characteristic among the men–the common thread–was race (JA 20).

Three modifications to the program were requested by Defendant Longo in April 2004. (Longo Dep. JA 59)  One of the three changes included, for the first time, that "patrol officers would not initiate requests for buccal swabs" (*Id.*).  "[T]hey would get information. . . and they would forward that information to an investigator. The investigator would make a determination ... as to whether or not the person would be approached." (*Id*).  That is, prior to April 2004, patrol officers out on the street *did* initiate their own requests for buccal swabs.  A second modification was that the persons being approached now "were to be told that they had the right to refuse if they so desired."  (*Id*.)  The third modification was that the DNA samples would be destroyed.  (*Id*.)

10

# SUMMARY OF ARGUMENT

As repeatedly stated by the Supreme Court and this Court, the Equal Protection Clause requires that all racial classifications by government actors be subjected to strict scrutiny analysis.  This is true even when the  purposes of the classification are benign and logical.  The Supreme Court has also recently clarified that strict scrutiny applies any time race is considered, even if it is only one among many factors that the government evaluates.

The Defendants in the present case adopted a specific policy of seeking DNA samples only from black men in order to have these men establish that they were not a serial rapist being sought by the Charlottesville police.  The Plaintiff challenged this policy under the Equal Protection Clause.  The District Court dismissed the claim under Rule 12(b)(6) hold that despite the fact that only black men were targeted, and that they were specifically targeted because of their race, no race-based classification had occurred because the race of the assailant had been identified by the victims.

The District Court's conclusion cannot be squared with existing Supreme Court jurisprudence and permits the government to engage in race-based discrimination simply by allocating the job of racial classification to third parties.  Following the decision in *Grutter*, narrowly tailored searches relying in part on race are permissible

11

and the decision below should be reversed and the case remanded for strict scrutiny review.

The District Court also dismissed the Plaintiff's Fourth Amendment unreasonable seizure claim for failure to state a claim. The court did so after concluding that the facts alleged by the Plaintiff were insufficient to show that his belief that he was not free to terminate his interaction with the police was not objectively reasonable. The District Court erred in dismissing the claim under Rule 12(b)(6) because, given the procedural posture of the case, the Plaintiff was not yet under any obligation to establish all of the facts that would support his claim. The Plaintiff had alleged sufficient facts from which the basis for his claim could be inferred, and this is all that case law requires.

The District Court abused its discretion in determining that the Plaintiff would not make an adequate class representative. All class members are going to be black men from the Charlottesville area considered by the police to be potential serial rapists. An expectation that the Plaintiff, or any class member, will have a sophisticated understanding of the litigation is not reasonable. The Plaintiff demonstrated that he was personally motivated to see the case through to its conclusion and had a stake in its outcome and he would be an adequate representative.

# ARGUMENT

Faced with a serial rapist, the Defendants adopted a policy of asking large numbers of black men in the Charlottesville area to provide DNA samples in order to eliminate themselves from suspicion. The policy was to obtain samples only from black men. The District Court, deeming this not to be a governmental, race-based classification, dismissed the Plaintiff's Equal Protection Clause claims under Rule 12(b)(6) for failure to state a claim. The District Court also dismissed the Plaintiff's unreasonable seizure claims at the Rule 12(b)(6) stage, without taking into consideration the limited burden placed on the Plaintiff at this stage of the proceedings. Finally, the court declined to grant class action status because it concluded that the Plaintiff was not an adequate class representative. For the reasons set forth below these decisions were erroneous, and the case should be remanded for further review of the Equal Protection and unreasonable seizure claims, as well as for certification as a class action.

## Standard of Review

*Motions to dismiss.* This Court reviews the district court's decision to grant a motion to dismiss de novo. *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996). The factual allegations in the complaint must be accepted as true

13

and those facts must be construed in the light most favorable to the plaintiff. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). A Rule 12(b)(6) dismissal motion tests the sufficiency of a complaint, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

The Supreme Court's recent decisions in *Erickson v. Pardus*, ___ U.S. ___, ___, 127 S. Ct. 2197, 2200 (2007), and *Bell Atl. Corp. v. Twombly*, ___ U.S. ___, ___, 127 S. Ct. 1955, 1965 (2007), have created "considerable uncertainty" concerning the standard for assessing the sufficiency of pleadings, which uncertainty this Court has not yet resolved. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 188 n.7 (4th Cir. 2008). With respect to the dismissal of Count I, the impact of these decisions is immaterial as the District Court's decision did not rest on any supposed factual inadequacy. With respect to Count II these decisions may impact the analysis, and they are discussed below.

*Class certification*. This Court reviews a trial court decision denying class certification for abuse of discretion. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).

14

# I.   THE DISTRICT COURT ERRED IN HOLDING THAT NO RACE-BASED CLASSIFICATION OCCURRED WHEN THE DEFENDANTS SPECIFICALLY TARGETED ONLY BLACK MEN TO PROVIDE DNA SAMPLES IN ORDER TO HAVE THEM ESTABLISH THAT THEY WERE NOT THE SERIAL RAPIST BEING SOUGHT BY AUTHORITIES

Over a multi-year period the Defendants contacted black men, and only black men, residing in the Charlottesville area and requested that they provide DNA samples ostensibly so as to establish that they were not a serial rapist being sought by local police.  Despite the fact that the Defendants specifically targeted the Plaintiff and other class members because of their race, the District Court ruled that, as a matter of law, there was no race-based classification by the Defendants and denied the Plaintiff's Equal Protection Clause claim for failure to state a claim because no discriminatory intent or animus had been alleged.   Because the conclusion that no race-based classification had occurred is wrong, the decision below must be reversed and the case remanded for further proceedings.

**A.    Where government actors have adopted a policy which explicitly classifies by race, no separate allegation or proof of discriminatory animus or intent is required.**

The Fourteenth Amendment's equal protection clause states, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. The Clause requires that similarly-situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). When similarly-situated groups are treated dissimilarly such government action is reviewed by the courts under varying standards of scrutiny.

Because the core of the Fourteenth Amendment is the prevention of unjustified official distinctions based on race, *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 81 (1873); *Strauder v. West Virginia*, 100 U.S. 303, 307-08 (1880); *Ex Parte Virginia*, 100 U.S. 339, 344-45 (1880); *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), racial classifications bear a far "heavier burden of justification" than do others. *In re Griffiths*, 413 U.S. 717, 721 (1973); *Hunter v. Erickson*, 393 U.S. 385, 392 (1969); *Loving v. Virginia*, 388 U.S. 1, 9 (1966).

The Supreme Court and this Court have made clear that "all racial classifications, imposed by whatever federal, state, or local government actor, must

16

be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Williams v. Hansen*, 326 F.3d 569, 575-76 (4th Cir. 2003). This is true not only when race is the only criteria used in the classification process, but also when it is one "among many" factors considered by the government actor. *Grutter v. Bollinger*, 539 U.S. 306, 340 (2003).[4]

To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race. *Williams*, 326 F.3d at 583. There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause. "A plaintiff can point to a law or policy that expressly classifies persons on the basis of race [direct discrimination]. Or, a plaintiff can identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner [disparate treatment]. A plaintiff can also allege that a facially neutral statute or policy that is neutrally applied

---

[4]In this respect *Grutter* perhaps clarified the law more than changed it. As this Court had noted years earlier with respect to disparate impact/treatment cases, "the Equal Protection Clause 'does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes.' Rather, a plaintiff need only establish that racial animus was one of several factors that, taken together, moved the decisionmaker to act as he did." *Williams*, 326 F.3d at 584 (citations omitted).

17

nonetheless has an adverse effect on a protected group, and that the adoption of the statute or policy was motivated by discriminatory animus [disparate impact]." *Id.* at 584 (citations omitted). When proceeding on a direct discrimination basis, the plaintiff need not plead or prove discriminatory intent or animus, *Wayte v. United States*, 470 U.S. 598, 609 n.10 (1985), though he must do so when proceeding on a disparate impact/treatment claims, *Williams*, 326 F.3d at 584.

In the present case the Plaintiff alleged a direct discrimination claim, alleging that the Defendants' policy of seeking DNA samples only from black men contained an explicit, race-based classification and thus no allegation of discriminatory intent or animus was required.

**B.    It is both alleged and undisputed that the Defendant government actors had a policy of seeking DNA samples only from black men; this constituted a race-based classification as a matter of law and fact.**

In Count I Monroe contended that he was targeted to be approached to provide a DNA sample at least in part because of his race. That is, the Charlottesville police had a policy of seeking DNA samples for the serial rapist investigation only from black males. The District Court did not disagree with this, but held nonetheless that there was no "direct discrimination" (JA 171) and the Plaintiff was therefore required to allege discriminatory animus or intent. Because Monroe had not done so,

the claim was dismissed. (JA 171-72). The District Court's determination that the Plaintiff did not present a direct discrimination claim was erroneous, and an allegation of discriminatory intent was not required.

It is alleged in the Second Amended Complaint, and undisputed, that the Plaintiff was approached by Officer Mooney, a government actor, pursuant to a policy of the Charlottesville Police Department, promulgated by Defendant Longo, a government actor, as the final decision maker for Defendant City of Charlottesville, a municipal government. It is also alleged, and undisputed, that an element of the policy at issue was to approach only black men to provide DNA samples. This is a race-based government policy.

As noted, the Supreme Court and this Court have repeatedly held that "*all* racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc.*, 515 U.S. at 227 (emphasis added). The rule is absolute. Strict scrutiny applies regardless of whether the classifications benefit or burden historically disadvantaged groups, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494 (1989) (plurality opinion) (reaffirming the view that "the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefitted by a particular classification"), or even if they impose no differential burden or benefit

19

on different racial groups at all, *see Shaw v. Reno*, 509 U.S. 630, 651 (1993) (noting that "racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally"). This is so, the Supreme Court has indicated, because of the inherent difficulty in distinguishing benign classifications from illegitimate ones. *See Grutter*, 539 U.S. at 326. As this Court recently remarked, "[a]ll means all." *Choice Hotels Int'l, Inc., v. SM Prop. Mgmt., LLC*, 519 F.3d 200, 210 (4th Cir. 2008).

This strict rule, coupled with Justice Marshall's famous observation that strict scrutiny analysis is "strict in theory, but fatal in fact" *Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980) (Marshall, J., concurring), has appeared to leave courts such as the District Court in this case, with a normative problem. In certain situations, such as police investigation of a violent crime based upon a witness identification that includes the race of the assailant, the use of race as an explicit classifier makes obvious intuitive sense; after all, there is no point rounding up white people if the victims identified the assailant as black. Courts have apparently worried, though, that by calling this what it is–an explicit race-based governmental classification–they will doom routine, well-intentioned police work to unending juridical second guessing under the well nigh impossible to meet strict scrutiny standard. *See* Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*, 117 Harv. L. Rev. 493, 512 (2003)

20

(noting reluctance of courts to find that use of race by police in investigations constitutes race-based classification).

These concerns are no longer valid. In addition to establishing that strict scrutiny is required even where race is just one of multiple factors, *Grutter* was perhaps more important for establishing that strict scrutiny is no longer "fatal in fact."

> Strict scrutiny is not "strict in theory, but fatal in fact." Although all governmental uses of race are subject to strict scrutiny, not all are invalidated by it. As we have explained, "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." But that observation "says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny." When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied.

*Grutter*, 539 U.S. at 326-27 (citations omitted). The Court went on to approve the affirmative action program at issue in the case.

Thus strict scrutiny review is no longer a death knell for race-based government action. Race can properly be used, in conjunction with other criteria, to produce government action that is narrowly tailored to serve the compelling interest

21

of solving crimes without violating the constitutional rights of members of the minority community. *See id.* at 333-43.

> **C.    Criminal investigations limited to persons of a single race are race-based government classifications; however, investigating crimes is a compelling governmental interest and when race is used in conjunction with other factors, so as to produce a search which does not sweep too broadly, such investigations can be narrowly tailored so as to be constitutionally permissible.**

As set forth above, where police, based upon a victim's description, use race as a factor in deciding who to pursue in an investigation, there is indeed a governmental race-based classification taking place and it is subject to strict scrutiny analysis. This need not, though, produce the problems that courts previously, and the District Court in this case, seem to be concerned about.

Certainly the investigation of violent crime, and crime in general, is a compelling governmental interest, and that prong of the strict scrutiny test is easily met. The real issue posed by the present case, and *Oneonta* and similar cases, is whether the actions of the police in the specific instance were narrowly tailored to serve that compelling interest.

The use of race could be narrowly tailored so as to survive *Grutter*. Often this will involve the consideration of multiple factors *in addition to race* which

prevent the occurrence of dragnet searches such as those in the present case and in *Oneonta*. *See* Michael R. Smith, *Depoliticizing Racial Profiling: Suggestions for the Limited Use and Management of Race in Police Decision-Making*, 15 Geo. Mason U. Civ. Rts. L.J. 219, 235-36 (2005); *Jefferson v. City of Omaha Police Dep't*, 335 F.3d 804, 807 (8th Cir. 2003) (finding no equal protection violation where in addition to the suspect's race, the description "also included the suspect's gender, the color of his truck, the suspect's occupation, and the suspect's license plate number, and stating that "[i]n this context it was not improper for police officers to consider . . . race in conjunction with the other aforementioned characteristics."). This is precisely the analysis in which the Court engaged in *Grutter* when concluding that the program in that case survived strict scrutiny even though race was an explicit factor. It was the presence of identifiable additional characteristics, coupled with evidence that these other factors were actually considered, which permitted the Court to concluded that program was constitutional. *Grutter*, 539 U.S. at 339-40.

The decision in *Jefferson* is a good example of what can be achieved, however, when race is joined with an appropriate aggregation of other factors–stopping all black males who practice a particular trade and who are driving a vehicle with a particular license plate is not likely to produce more than a very small number of stops. At the other end of the spectrum are situations such as the instant

23

case where race is used in conjunction with little or nothing else and the results are massive efforts to encounter literally hundreds of people. Using race as the single criterion, or with few other truly meaningful factors, will always produce a dragnet which sweeps too broadly.

In the present case, the Plaintiff alleged that the policy at issue was not narrowly tailored and that race was the only consistent factor used by the police. The Defendant chief of police admitted during his deposition that the only factor that the subjects of the DNA search had in common was their race. Rather than applying strict scrutiny and *Grutter*, the court entirely avoided the question of whether the investigation was narrowly tailored and said that there was no race-based classification at all. For the reasons that follow, this was error.

> **D.    The District Court's approach, concluding that fact that the policy of seeking DNA samples only from black men derived from victim reports identifying the assailant as a black male stripped the policy of its explicit, race-based classification creates fundamental problems when applied to other instances of governmental discrimination.**

Rather than apply strict scrutiny analysis, the District Court simply denied that a racial classification was made at all and thus avoided the question entirely. As the District Court succinctly stated its position: "(1) when a victim of a crime provides investigators with a description of her assailant, (2) that description includes the

24

assailant's race and gender, and (3) investigators then act on that description, there is no express racial classification." (JA 170). Among the problems with this is approach is that it requires that one ignore the obvious nature of what was going on in this case, and it results in tremendous problems in addressing other instances of what clearly would be governmental, race-based discrimination.

      1.  The fact that the racial description is made by a third party and then relied on by the government cannot render the classification non-race-based, otherwise the government could simply outsource discrimination to third parties and avoid constitutional scrutiny.  What the District Court says, reduced to its most basic level, is that when an explicitly race-based classification is provided to the government by a third party, the government may act upon that classification without it being discrimination simply by virtue of the fact that a third party was the source of the discrimination.  For more than a half century, though, the Supreme Court has made it clear that state action which incorporates a privately originated, race-based, classification does in fact constitute impermissible race-based discrimination by the government.  *See Shelley v. Kraemer*, 334 U.S. 1, 20-21 (1948) (holding that state court enforcement of private race-based restrictive real estate covenants is unconstitutional); *see, e.g., Evans v. Newton*, 382 U.S. 296, 297 (1966) (noting that

municipality could not maintain a segregated park even though will conveying land to the municipality provided that park be segregated).

The reasons for this are obvious.  Were this not the case then government actors could easily circumvent the Equal Protection Clause by the simple expedient of procuring the assistance of a third party.  A straightforward hypothetical demonstrates the significant problems with the District Court's approach.  Assume that a municipality created a contractor set aside program that limited contractor involvement in municipal construction projects to only those contractors recommended by a private, citizens' "contractor advisory panel."  If the panel recommended only black contractors for participation in the set aside program, and made clear that race was its only consideration, it is inconceivable that such a program would not be found unconstitutional under *Adarand Constructors, Inc.*[5]  Yet under the District Court's analysis the program would be perfectly permissible because the racial classification was not made by the municipality but by the private citizens' advisory panel.  Applying the District Court's rule in a situation where it makes no normative sense demonstrates the fundamental problems with it.

---

[5]Even if the panel relied upon other factors in addition to race, the outcome under *Grutter* would be the same.

The District Court cited a single case in support of its holding, *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999). While *Brown* does indeed state what the District Court said it does, the Second Circuit's conclusion in *Brown* has been roundly criticized precisely because its conclusion is so problematic.[6]

The court in *Brown* stated its rationale thus: "Defendants' policy was race-neutral on its face; their policy was to investigate crimes by interviewing the victim, getting a description of the assailant, and seeking out persons who matched that description." *Id*. at 337. I.e., the classification was not race-based–we are going to approach black people–but supposedly race neutral–we are going to approach people who match the description given by the victim.[7]

_____

[6]*See, e.g.,* Primus, 117 Harv. L. Rev. at 512 ("Oneonta raises the question of why a court staffed with intelligent judges would deny the existence of a racial classification in that case."). The answer, Professor Primus suggests, "is bound up with the normative reasonableness of using racial descriptions to identify criminal suspects. Believing that such racial descriptions are "altogether legitimate [when based on] . . . a physical description given by the victim of a crime," the court wished to avoid a holding that would subject reasonable, garden-variety police procedures to a strict scrutiny apparatus that almost always results in the invalidation of the examined practice. It therefore decided that the police had not used a racial classification. To be sure, the court could have acknowledged the existence of a racial classification and found that the use of a physical description of a suspect is a compelling state interest that survives strict scrutiny. That analysis would resemble the Supreme Court's opinion in *Grutter*. But three years before *Grutter*, the Second Circuit was loath to choose that course." *Id*. (citations omitted).

[7]That there actually was a race-based classification going on in the facts of *Oneonta*, notwithstanding the court's statements to the contrary, seems patently

The municipal park scenario from *Evans* demonstrates the fatal problem with this approach.  A city receives a gift of real estate to operate a park encumbered by a restriction that the park be used only for white people, and the city  excludes all non-white people from using the park.  When sued in federal court the city defends on the basis that there is no race-based discrimination because it is not excluding black people, but simply allowing to enter only those people who match the description of persons permitted to use the park as set forth in the restrictive language imposed by the grantor who gave the park to the city.  Such a defense is, of course, untenable, yet it is precisely what the District Court permitted in the present case.

The District Court's argument that the Defendants were not following a race-based policy of only seeking DNA samples from black men, but instead engaged in a race-neutral policy of only seeking DNA samples from people who matched the

---

obvious from the discourse between the various camps in the Second Circuit's subsequent decision denying rehearing en banc.  *See Brown City of Oneonta*, 235 F.3d 769, 772-73 (2d Cir. 2000) (Walker, C.J., concurring in denial of rehearing en banc) (noting that police work sensibly relies on racial descriptions every day, that the finding of a racial classification would require the application of strict scrutiny, and that strict scrutiny is and should be almost impossible to withstand); *id.* at 786 (Calabresi, J., dissenting from denial of rehearing en banc) ("The problem is that the strict scrutiny criteria developed by the Supreme Court are much too blunt. If an action is deemed a racial classification, it is very difficult, under the Supreme Court precedents, ever to justify it.").  The court seems to have been well aware that a racial classification was involved but unwilling to say so because of the perceived difficulty this would create for the police.

victims' description (i.e., black men) is untenable because it rapidly leads to absurd results.

2. The alternative argument, that because some factors other than race were also included in the determination of from whom to pursue a DNA sample the policy was not race-based, is also unavailing. Arguably, the District Court read too much into the Second Circuit's decision. In the sentence immediately following the quoted one, the Second Circuit stated "[t]his description contained not only race, but also gender and age, as well as the possibility of a cut on the hand. In acting on the description provided by the victim of the assault--a description that included race as one of several elements--defendants did not engage in a suspect racial classification that would draw strict scrutiny." *Id.* The court may well have been operating on the assumption that where the state actor relied on factors in addition to race it was not an impermissible, race-based classification. This also seems to have played a role in the District Court's decision in the present case. (JA 172) (noting other factors besides race that may have played a role).

First off, as discussed above, the use of "race plus" for concluding that there was no race-based *classification* is simply untenable after *Grutter*.[8] The Court

---

[8]As noted above, while the "plus" factors are critical to the analysis of whether the government classification was *narrowly tailored*, they are immaterial to

held in *Grutter* that even where race is merely one among many factors considered by the government, strict scrutiny still applies to review of the classification.   As Professor Primus points out, even if the presence of other factors were considered this would still not result in a non-race-based classification.   For example, drawing on the facts in *Brown*, if a municipality developed a contractor set aside program for young black contractors with cuts on their hands no one would argue that such a program was not a race-based program barred by *Adarand*.

This District Court's decision in this case is the proverbial one where hard facts have lead to the making of bad law.   The jurisprudence of the Supreme Court and this Court is clear that *all* raced-based classifications by government actors are to be subjected to strict scrutiny, even where the rationale for the classification is benign.   In order to avoid calling the race-based classification in this case what it is, and thus force reasonable police action into the vice grip of strict scrutiny review, the District Court took the expedient of simply denying the obvious.   In doing so it leads to absurd results where government actors may insulate overt discrimination by entrusting it to third parties.

---

the determination of whether there was a race-based *classification* at all.

30

The irony in the present case is that after this case was dismissed the serial rapist was apprehended. The police did so using traditional investigative techniques that narrowed their focus to a particular individual. Once this person was identified the police then obtained a DNA sample from him surreptitiously. Requiring the police to carry out their investigations in a narrowly tailored fashion will not impose undue burden upon the police. To the contrary, it is what police naturally do to make their own jobs easier. If the police know that the assailant is white, they do not elect to seek DNA samples from thousands of white people on the off chance that one of them will turn out to be from the perpetrator; that would be a phenomenal waste of limited resources. The Equal Protection Clause requires that they do the same when the assailant is black.

The correct analytical approach requires this Court to hold that the Defendants did indeed engage in a race-based classification when they decided to obtain DNA samples only from black men and to remand the case to the trial court for that classification to be subjected to strict scrutiny review and a determination of whether the investigation in this case was sufficiently narrowly tailored.[9]

---

[9]The Supreme Court's statement that all race-based classifications are subject to strict scrutiny review is binding upon this Court, just as this Court's identical statement in *Williams* is binding upon this panel. If the Defendants want to create an exception to this rule for police investigations based upon witness

31

---

identifications, then they may petition for certiorari review and make that argument to the Supreme Court which is the only body with the authority to alter its prior precedent.

## II    THE DISTRICT COURT ERRED IN RULING THAT, AS A MATTER OF LAW, THE PLAINTIFF COULD NOT STATE A CLAIM FOR UNREASONABLE SEIZURE BECAUSE IT FAILED TO RECOGNIZE THE LOW BURDEN PLACED ON THE PLAINTIFF AT THE PLEADING STAGE.

In Count II of the Second Amended Complaint the Plaintiff alleged that he and other class members had been subjected to unreasonable seizures when they were approached by the police and asked to provide DNA samples. The District Court granted the Defendants' motion to dismiss this claim, finding that the Plaintiff had failed to allege sufficient facts to support the claim. The District Court's decision was in error as it failed to acknowledge the lower burden placed on the Plaintiff at the pleading stage.

### A.    Whether a person's belief that they were not free to decline a police officer's entreaties was reasonable is a context specific inquiry and a determination at the Rule 12(b)(6) stage that no claim could be made out deprived the Plaintiff of an opportunity to fully establish the context.

In *Florida v. Bostick*, 501 U.S. 429 (1991), the Supreme Court enunciated the legal test for an unreasonable seizure in the context of a public encounter between a citizen and the police where the citizen has no desire to leave the

33

scene of an encounter with police. "[T]he appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436. This test calls for a "contextual approach," that takes into account all of the circumstances surrounding the incident. *See Michigan v. Chesternut*, 486 U.S. 567, 572-573 (1988); *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984); *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991); *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989) ("What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary with the police conduct at issue and the setting in which the conduct occurred."). Moreover, the Supreme Court has identified a number of factors that might suggest that a seizure has occurred, even where the person who may have been seized did not attempt to leave, including the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (citations omitted).

The District Court, citing this Court's decision in *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002), stated that whether a reasonable person would have felt free to terminate the interrogation was a question of law appropriate for determination by the court upon a motion to dismiss. This oversimplifies the

34

matter, however. The Supreme Court has stated that the question of whether a person has been seized, i.e., would a reasonable person feel free to terminate the interrogation and depart, is a *mixed question of law and fact*. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The question of what the historical facts were surrounding the encounter is one of fact, but the determination of whether a reasonable person would have felt free to terminate the discussion and leave requires an application of law to fact. *Id*.

At summary judgment, when all of the facts are supposedly in, the trial court could legitimately make a determination of the objective reasonableness of the plaintiff's state of mind as a matter of law, based upon all of the facts that are in the record (provided that none are in dispute). The District Court's decision in this case, though, was made at the 12(b)(6) stage, long before the Plaintiff was under any obligation to set forth *all* of the facts that would support his claim. At the 12(b)(6) stage the Plaintiff only has a burden "sufficiently [to] allege facts to allow the Court to infer that all elements of each of his causes of action exist." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 344-45 (4th Cir.), *reh'g en banc denied*, 467 F.3d 378 (4th Cir. 2006), but he is under no obligation to plead "facts sufficient to prove [his] case." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

In the Second Amended Complaint, the Plaintiff explicitly alleged as follows.

35

The encounter between Monroe and Defendant Mooney was not a consensual encounter in that Monroe had both an objectively and subjectively reasonable belief that he was not free to decline the officer's request or otherwise terminate the encounter without suffering adverse consequences. Second Amended Complaint at ¶ 26 (JA 182).

Defendant Mooney was in uniform and did not inform Mr. Monroe that he was at liberty to stop speaking with him or that he could decline to provide a DNA sample without repercussion. Id. at ¶ 27 (JA 182).

Mooney approached Mr. Monroe at his home where his interaction with Mr. Monroe would be visible by other members of the community. Mr. Monroe was concerned that if other members of the community observed him talking with Defendant Mooney he would be perceived as a snitch and be at risk of retribution from other members of the community. In order to hasten the end of the interaction he felt compelled to agree to the request. Id. at ¶ 28 (JA 182).

In addition, Mr. Monroe understood, based on his prior interactions with police officers, and the interactions of other members of his community with the police, that 'if the police ask you to do something, you do it. You don't question their authority over you. If I didn't, if I said no, I'd end up downtown,' [i.e. be taken to the police station against his will]. Mr. Monroe understood that there was intense pressure upon the Charlottesville police to apprehend the serial rapist and as a result believed that he would not be permitted to simply decline the request without his declining itself being used by the police as a possible indication of his guilt and resulting in his being subject to additional scrutiny then or at a later time. Id. at ¶ 29 (JA 183).

36

It was also Mr. Monroe's belief, based upon his prior interactions with the police and those of other members of his community, that Mooney's approaching him at his home, as opposed to in an open public area, also indicated that he was not free to terminate the interaction. In his words, '[the police] don't come to your home unless they got a reason to. When they come to your house, that means they mean business, so you got to do what they say to do.'
Id. at ¶ 30 (JA 183).

Mr. Monroe's belief that once approached by Mooney he was not free to terminate the interaction without consequences was objectively reasonable. The state of relations between law enforcement and members of the minority communities in the United States is such that it has led at least one Justice of the United States Supreme Court to observe that beliefs among minority community members that they are safer fleeing from the police than cooperating with them are neither 'aberrant' or 'abnormal' . . . Thus, in a situation such as the present where Monroe did not have the option of fleeing, his belief that he was compelled to cooperate was perfectly understandable." Id. at ¶ 31 (JA 183).

In the present case, the District Court found the Plaintiff's allegations in his Second Amended Complaint, standing alone, insufficient to actually establish the objective reasonableness of his belief that he was not free to terminate the discussion with the officer. This misperceives the obligations of the Plaintiff, and the court, under Rule 12(b)(6).

37

The District Court's analysis creates an insurmountable problem for plaintiffs alleging unreasonable seizures. Clearly a Rule 12(b)(6) motion does not obligate a plaintiff to plead all facts in support of his claim or even enough facts to prove the claim. Yet the District Court here ruled that because the Plaintiff did not allege enough facts to show that as a matter of law a reasonable person would not have felt free to terminate the encounter the claim had to be dismissed. There is no meaningful difference between what a plaintiff must allege to pass the 12(b)(6) stage under the District Court's analysis (sufficient facts to demonstrate as a matter of law that the plaintiff was seized) and what the plaintiff would have to prove at trial (sufficient facts to demonstrate as a matter of law that the plaintiff was seized).

In order to preserve any meaning in the difference between Rule 12(b)(6) and Rule 56 in unreasonable seizure cases the plaintiff's burden at the former stage has to be something *less* than the burden imposed by the District Court here.

The decision in *Twombly*, is perhaps useful here. At the least, the Court stated, a plaintiff must allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct that goes beyond mere speculation. *Twombly*, ___U.S. at ___, 127 S. Ct. at 1965. Where a "complaint does not set forth a single fact in a context that suggests" the required element, then dismissal under Rule 12(b)(6) is proper. *Id*. at 1968-69.

38

The question at the 12(b)(6) stage was not whether the Plaintiff had plead enough facts to actually *prevail* on his claim that he was seized, but only whether he had plead enough facts from which the trial court could *infer* a basis for the claim that he had been seized and which, when supplemented by such additional facts as might come to light during discovery, might ripen into a sufficient factual showing that he had actually been seized. The 12(b)(6) test assumes that a plaintiff will, prior to summary judgment, have the opportunity to adduce more facts in support of his claims. Once discovery was completed in the case the court could then determine whether, based on the facts alleged in the amended complaint, *and all other facts touching on the issue which were adduced during discovery*, the Plaintiff's beliefs were objectively reasonable. By dismissing the claim at the 12(b)(6) stage the District Court denied the Plaintiff the opportunity to fully establish the record on the seizure claim.

The present case is not one where the Plaintiff alleged no facts in support of his claim that he was seized, he simply alleged facts which the District Court found were not sufficient to establish the claim. This is *not* what a plaintiff is required to prove at the Rule 12(b)(6) stage. *Bass*, 324 F.3d at 765. While it may be frustrating for the trial court where the issue is ultimately going to be one of law (or the legal component of a mixed question of law and fact) for the court to resolve, the plaintiff

39

is nonetheless entitled to the full benefit of discovery before a court concludes that he cannot show, as a matter of law, that he was seized.

Accordingly, because the Plaintiff alleged sufficient facts from which a seizure might be inferred, the decision below dismissing the claim under Rule 12(b)(6) was in error and should be reversed.

### III.   THE PLAINTIFF IS AN APPRO-PRIATE CLASS REPRESENTATIVE, DESPITE HIS LACK OF LEGAL SO-PHISTICATION, AND THE DECISION THAT HE WAS NOT SHOULD BE REVERSED

The District Court held two hearings on class certification, one in July of 2006 and the other in July of 2007.  The first hearing had been preceded by depositions of Mr. Monroe and others, and other discovery by the parties, specifically directed at the issue of class certification.  Following the second hearing, the court denied the request, finding that the Plaintiff would not make an adequate class representative.  For the reasons set forth below, this was error and the the case should be remanded for further consideration of the class certification issue.

Class certification is governed by Fed. R. Civ. P. 23.  Plaintiffs bear the burden of demonstrating satisfaction of the Rule 23 requirements and a district court is required to make findings on whether the plaintiffs carry their burden.  *Thorn v.*

*Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006). Rule 23 is divided into a number of parts; for a class to be certified, all of the requirements of Rule 23(a) must be satisfied and the proposed class must fall into one of the three categories set forth in Rule 23(b).

Rule 23(a) provides that "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." These requirements are often referred to by the short-hand terms numerosity, commonality, typicality and adequacy. *Thorn*, 445 F.3d at 318. Under Rule 23(a), the Defendants contested only the issue of the Plaintiff's adequacy as a class representative. (JA 294)

The adequacy inquiry under Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Adequacy of representation is established "where that person [the class representative] (i) does not have interests that are adverse to the interests of the class, (ii) has retained competent counsel, and (iii) is otherwise competent to serve as class representative." *In re Cable and Wireless,*

41

*PLC, Securities Litigation*, 217 F.R.D. 372, 375 n.5 (E.D. Va. 2003) (citation omitted); *see, e.g., Robinson v. Gillespie*, 219 F.R.D. 179, 185 (D. Kan. 2003) ("Under Rule 23(a)(4), the proposed class representatives must assure the court that their interests are sufficient to induce vigorous advocacy on their part; that their interests are not antagonistic to those of class members; and that they have the means, including competent counsel, to pursue their case." (citation omitted)); *Wagner v. NutraSweet Co.*, 170 F.R.D. 448, 451 (N.D. Ill. 1997) ("The adequacy requirement has three elements: (1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the named representative must have a sufficient interest in the outcome to ensure vigorous advocacy; and (3) counsel for the named plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously." (internal quotations and citations omitted)).

Two hearings were held by the District Court on the issue of class certification. The first took place on July 13, 2006, the second on July 20, 2007. Prior to the 2007 hearing on the request for class certification the Defendants filed a memorandum which included an affidavit from Officer Sclafani which recounted certain discussions purportedly having taken place between him and Larry Monroe in May of 2006 (JA 213-14). Given the fact that the July 2007 hearing was taking place

42

in Lynchburg instead of Charlottesville, that Mr. Monroe, unlike Officer Sclafani, would not be compensated for his time in attending the hearing, that the Sclafani affidavit related only to events that were then over a year old and predated the much more probing examination of Mr. Monroe at his deposition on these same issues, that the material in the affidavit could have been presented at the 2006 hearing but was not, and that Plaintiff's counsel understood the purpose of the 2007 hearing to be to revisit argument in light of intervening procedural events in the case rather than to present additional evidence, counsel did not have Mr. Monroe attend the hearing, deeming it to be a situation that could adequately be addressed by argument or testimony of counsel at the hearing.  At the hearing it became apparent that counsel's evaluation of the situation was perhaps overly optimistic, and the Court indicated that it would prefer to hear from Mr. Monroe.  Accordingly, on the following Monday, the next business day, counsel submitted an affidavit from Larry Monroe that responded to some of the points raised in Sclafani's affidavit.  The District Court refused to consider this affidavit, ruling that it was untimely.

### A. The District Court's consideration of the Sclafani affidavit, while refusing to consider the Monroe affidavit, was an abuse of discretion.

The historical context of the 2007 hearing is important.  The same matter had been heard a year previously, right after the depositions in the case relating to class

43

status had taken place and after the supposed incidents referred to in the Sclafani affidavit.[10]  Yet neither an affidavit nor the testimony of Sclafani were offered at the July 2006 hearing, even though the identical issues were before the court and the alleged incidents took place only a month and a half earlier.[11]  Nothing substantive of an evidentiary nature relating to class certification took place in the intervening time and the parties agreed that the evidence tendered at the July 2006 hearing would be used at the July 2007 hearing.  While the court did enter an order regarding the provision of additional *memoranda* prior to the 2007 hearing, the order made no reference to, and imposed no time limits upon, the submission of additional evidence.  (JA 211-12).

Plaintiff is entitled to a "full opportunity to develop a record containing all facts" pertaining to class representation."  *International Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1268 (4th Cir. 1981).  The July 2007 hearing was one on class certification, not a trial on the merits.  The Monroe affidavit was submitted the next business day and well before the court ruled on the matter.  No specific discussion of the timing for submission of evidence (or that additional

---

[10]The reason for the time gap between hearings was that the case meandered procedurally while the various motions to dismiss and the resultant second amended complaint were wended their way through the court.

[11]It is also worth noting that no questions were put to Monroe about these supposed incidents in his June 2006 deposition on the issue of class certification, though presumably the incident would then have been fresh in Sclafani's mind.

44

evidence would be adduced at all) had been discussed among counsel or elucidated by the court prior to the hearing. The Monroe affidavit directly contradicts the statements made by Sclafani and refusing to consider the affidavit creates significant prejudice to the Plaintiff while its consideration would not in any meaningful way prejudice the Defendants.[12]

The District Court's refusal to consider the Monroe affidavit was, under the facts of this case, an abuse of discretion, and the matter should be returned to the trial court for consideration of the affidavit in the context of ruling on the request for class certification.

**B.** **Even without consideration of the Monroe affidavit, Mr. Monroe would be an adequate class representative.**

Mr. Monroe's claims are indistinguishable from those of the other class members. Consequently, there is nothing about the factual predicate for his claim that would make his interests adverse in any way to those of the rest of the class members. Defendant Longo at his deposition indicated that he was unaware of facts which made Mr. Monroe's situation unique, rather succinctly stating that "the common thread

---

[12]Had the trial court concluded that it needed additional testimonial evidence to resolve the dispute between the affidavits it certainly could required a hearing.

45

among them [the proposed class members] is their race." (Longo Dep. at 6). He further indicated that on a personal level his interaction with Mr. Monroe has been cordial (Longo Dep. at 4, 5). Mr. Monroe testified that his desire in pursing this action was to seek "closure" and compensation for the injury to his constitutional rights, goals which are certainly shared by the other members of the class as well.

In determining whether a proposed class representative can serve competently in that role courts look to a variety of factors. Plaintiffs may be found to be inadequate representatives where they lack personal knowledge concerning the type and extent of damages they have suffered, where they lack credibility concerning their liability claims, or where they have afforded their attorneys unfettered discretion to conduct the litigation. *Robinson*, 219 F.R.D. at 186. "This inquiry into the knowledge of the representative is to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney; the named party must be an adequate representative in addition to having adequate counsel." Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1766 (2d ed. 1986).

Unlike the types of class-action cases which have drawn the ire of legislatures lately–such as suits over the width of computer monitor screens–this case involves direct physical acts against the class members. Mr. Monroe is well aware of what was done to him and the impact that it had on him. His credibility on issues of

liability would appear to be unimpeachable as the Defendants agree that he was one of the people approached and that he provided a DNA sample. There is no evidence that Mr. Monroe has any physical or mental conditions that would negatively impact his ability to serve as class representative.

The District Court's concern was that Mr. Monroe would not exercise sufficient control over counsel or pursue the claims vigorously (JA 297). Though at his deposition Mr. Monroe was unclear as to why the case was in federal court (though he did explain that he agreed with it being there because he thought the state court decision was wrong) (JA 75-89), a lay person's lack of knowledge over the interplay between federal and state court jurisdiction is unsurprising. Deferring to counsel's judgment as to the appropriate forum in which to pursue claims is hardly ceding entire control of the case to counsel,  The core issue on control is whether the proposed class representative can exert control over counsel where the interests of counsel might diverge from those of the class.

Arguing that Mr. Monroe has not controlled counsel is a red herring in that there is no evidence in the record of anything counsel has done that would have required client "control" or which counsel has done despite protests from Mr. Monroe.  As the court is well aware, clients come to lawyers precisely because the lawyer has expertise which the client lacks.  Unless and until evidence is adduced

47

demonstrating something that necessarily required control by the client, and a refusal by the proposed class representative to provide the necessary input, it is simply speculation to say that Mr. Monroe is not able to exert sufficient control.

Some courts have found that Rule 23(a)(4) was not satisfied where the named plaintiffs demonstrated insufficient participation in and awareness of the litigation. *See, e.g., Darvin v. International Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985); *Massengill v. Board of Educ.*, 88 F.R.D. 181 (N.D.Ill. 1980). However, adequate class representation generally does not require that the named plaintiffs demonstrate to any particular degree that individually they will pursue with vigor the legal claims of the class. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987). The class members in this case are going to be African-American males suspected by the authorities of being serial rapists. The claims in the case are straightforward. The level of supervisory control that would perhaps be needed in securities litigation, the types of cases cited by the District Court in its decision (JA 297), is simply not the same in a civil rights case such as the present.

Given the nature of the claims presented in this case, and Mr. Monroe's testimony regarding his involvement in the case and his desire to see that the wrongs done to him and other class members are righted, he would make an appropriate class

48

representative.  The District Court's decision to the contrary should be reversed, and

the case remanded for further proceedings.[13]

---

[13]For the first time at the 2007 hearing the Defendants' indicated that they also challenged class certification under Rule 23(b).  However, the District Court never reached this issue.  (JA 294 n.2).  Without conceding that the Defendants could raise the issue at this late juncture, the Plaintiff does agree that the District Court would still have to make affirmative findings on the Rule 23(b) question, which it has not yet done.  Accordingly, a remand for further consideration would seem to be the proper course of action.

## CONCLUSION

For the foregoing reasons, the decisions of the District Court dismissing the Plaintiff's equal protection and unreasonable seizure claims should be reversed, as should the decision finding the Plaintiff not be an adequate class representative, and the case should be remanded for further proceedings.

Respectfully submitted,

LARRY MONROE,

by counsel.

/s/ Neal L. Walters
Neal L. Walters, Esq.
Virginia State Bar No. 32048
Attorneys for Plaintiff
Scott*Kroner PLC
418 East Water Street
P.O. Box 2737
Charlottesville, VA 22902
Telephone: (434) 296-2161
Fax: (434) 293-2073
E-mail:  nwalters@scottkroner.com

Deborah C. Wyatt, Esq.
Virginia State Bar No. 17918
Attorney for Plaintiff
300 Court Square
Charlottesville, VA 22902
(434) 296-4130

50

(434) 297-3083 (fax)
E-mail:  Dwesq@aol.com

Counsel for Appellant.

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE AND LENGTH LIMITATIONS

Counsel for the Appellant certifies:

1.  That this brief has been prepared using WordPerfect 12.0, and the typeface Times New Roman 14 point.

2.  That exclusive of the table of contents, table of authorities, and certification of service, the brief contains 11,036 words.

Counsel for the Appellant understands that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

/s/ Neal L. Walters
Neal L. Walters, Esq.
Counsel for Appellant

52

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25, I hereby certify that I have this 4th day of June, 2008, filed the required copies of the Appellant's Brief and Joint Appendix in the Clerk's Office of the United States Court of Appeals for the Fourth Circuit by hand delivery, and I further certify that I mailed the same date the required copies of the Brief and Joint Appendix first class postage prepaid to:

Richard H. Milnor, Esq.
Alvaro A. Inigo, Esq.
Zunka, Milnor, Carter & Inigo, Ltd.
P.O. Box 1567
Charlottesville, VA 22902

/s/ Neal L. Walters
Neal L. Walters, Esq.
Counsel for Appellant

This brief was electronically filed with the United States Court of Appeals for the Fourth Circuit this 4th day of June, 2008.